UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

GREGORY BOU,                   :    HONORABLE JOSEPH E. IRENAS
                               : Civ. Action No. 11-6356(JEI/AMD)
          Plaintiff,           :
                               :              **OPINION**
    v.                         :
                               :
                               :
STATE OF NEW JERSEY, et. al., :
                               :
          Defendants.          :
                               :
_____

**APPEARANCES:**

PATRICK GECKLE, LLC
By: Michael Cortese, Esq.
1500 J.F.K. Blvd., Suite 1850
Philadelphia, PA 19102
          Counsel for Plaintiff

STATE OF NEW JERSEY, OFFICE OF THE ATTORNEY GENERAL
By: Roshan Deven Shah, Deputy Attorney General
RJ Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
          Counsel for Defendants

**IRENAS**, Senior District Judge:

Plaintiff Gregory Bou initiated this action to recover for injuries sustained when two New Jersey State Police Troopers attempted to take him to the hospital following a 911 call from Plaintiff's school nurse.  Plaintiff asserts statutory claims under 42 U.S.C. § 1983 ("§ 1983") and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, as well as common law claims for

1

assault, battery and intentional infliction of emotional distress.[1]  Pending before the Court is Defendants Michael DePinto and Charles Hurley's Motion for Summary Judgment.  For the reasons stated herein, Defendants' motion will be granted in part and denied in part.


## I.

Plaintiff Gregory Bou is a student at the Sequoia Alternative Program ("Sequoia") (Def.'s S.O.M.F. ¶ 1; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 1-4.)[2]  He suffers from bipolar disorder and schizoaffective disorder.[3]  (Pl.'s Br. in Opp., Ex. C 16:11-17:18.)

---

[1]    This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

[2]    References to "Def.'s S.O.M.F." are to Defendants' Statement of Material Facts submitted in support of their Motion for Summary Judgment.
   References to "Pl.'s Resp. to Def.'s S.O.M.F." are to Plaintiff's Response to Defendants' Statement of Material Facts, which accompanied Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment.

[3]    "Schizoaffective disorder" is described as a condition in which a person experiences a combination of symptoms of schizophrenia – such as hallucinations or delusions – and of mood disorder – such as mania or depression. *Schizoaffective Disorder Definition*, mayoclinic.com, http://www.mayoclinic.com/health/schizoaffective-disorder/DS00866 (last visited Jul. 23, 2013).

On November 18, 2009,[4] New Jersey State Police Troopers Michael DePinto and Charles Hurley responded to a 911 call from Plaintiff's school nurse to provide security for a medical assist at Sequoia.  (Def.'s S.O.M.F. ¶¶ 4-6; Pl.'s Resp. to Def.'s S.O.M.F ¶ 1.)  Defendants assert that dispatch indicated the subject, who unbeknownst to Defendants at the time was Plaintiff Gregory Bou, had possibly over-medicated himself and was irate or belligerent.  (Def.'s S.O.M.F. ¶ 5).

Earlier in the day, Plaintiff accepted an orange, octagonal pill, later identified as suboxone, from a classmate to help him relax.  (Pl.'s Brief in Opp., Ex. C 24:20-24, 29:2-12.)  Shortly thereafter, Plaintiff claims he began to feel anxious, which necessitated a visit to school nurse Therese Land.  (*Id.* at 30:8-22, 31:6-13.)  Plaintiff did not tell Nurse Land that he had taken a classmate's suboxone, but instead that he was suffering from anxiety as a result of taking too much of his own

---

[4]     The Court accepts that the incident at issue took place on November 18, 2009 despite the fact that the Defendant's S.O.M.F. states the date as November 21, 2009.  Prior proceedings in this case, surveillance video, and Bou's deposition testimony all make clear that the correct date is November 18, 2009. See *Bou v. New Jersey*, 2012 WL 1600444, at *1 (D.N.J. 2012); (Pl.'s Br. in Opp., Ex. C 15:6-12.)

medication.  (Pl.'s Supplemental S.O.M.F. ¶ 2;[5] Def.'s Resp. to

Pl.'s Counter-S.O.M.F. ¶ 2.)[6]

　　　After meeting with Plaintiff, Nurse Land called 911.

(Pl.'s Brief in Opp., Ex. F 31:17-19.)  Troopers DePinto and

Hurley reported to Sequoia in response to the 911 call.  (Def.'s

S.O.M.F. ¶ 7; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 6-12.)  Trooper

DePinto was the first to arrive at the scene.[7]  (Def.'s S.O.M.F.

¶¶ 11-12; Pl.'s Resp. to Def.'s S.O.M.F. ¶ 6-12.)  Trooper

DePinto first conversed with Nurse Land, who DePinto testified

in his deposition told him that Plaintiff was acting disorderly

and disruptive.  (Pl.'s Br. in Opp., Ex. E 21:20-22:7-10.)

After conversing with Nurse Land, Trooper DePinto stepped into

---

[5]　　References to "Pl.'s Supplemental S.O.M.F." are to
Plaintiff's Supplemental Statement of Material Facts which
accompanied Plaintiff's Brief in Opposition to Defendant's
Motion for Summary Judgment.

[6]　　References to "Def.'s Resp. to Pl.'s Counter-S.O.M.F." are
to Defendants' response to Plaintiff's Supplemental Statement of
Material Facts which accompanied Defendants' Brief in Reply to
Plaintiff's Opposition to the Motion for Summary Judgment.

[7]　　Both Trooper Hurley and Trooper DePinto understood Sequoia
to be a school for children with behavioral problems.  (Def.'s
S.O.M.F. ¶¶ 8-10; Pl's Response to Def.'s S.O.M.F. ¶ 6.)  More
specifically, Trooper DePinto believed Sequoia to be an
alternative school for students who had drug problems or were
frequently disciplined in their regular assigned school
districts.  (Def.'s S.O.M.F. ¶ 8; Pl's Resp. to Def's S.O.M.F. ¶
6.)  Similarly, Trooper Hurley believed Sequoia was a "last
chance school" for kids that have been "kicked out of every
other school."  (Def.'s S.O.M.F. ¶ 9; Pl.'s Resp. to Def.'s
S.O.M.F. ¶ 6.)

the hallway to speak with Plaintiff, who had been notified that
he was going to be transported to the hospital and was scared.
(Def.'s S.O.M.F. ¶ 16, 18; Pl.'s Supplemental S.O.M.F. ¶ 5;
Def.'s Resp. to Pl.'s Counter-S.O.M.F. ¶ 5.)

       Next to arrive was Trooper Hurley, who met with the school
principal upon arrival.   (Def.'s S.O.M.F. ¶ 19; Pl.'s Resp. to
Def.'s S.O.M.F. ¶ 15-19.)  In his deposition, Trooper Hurley
testified that the principal informed him that Plaintiff had
possibly overmedicated and was "either not happy or irate."
(Def.'s S.O.M.F. ¶¶ 19-20; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 19-
20.)  However, neither the principal nor Nurse Land told
Troopers DePinto and Hurley that Plaintiff was dangerous.
(Pl.'s Supplemental S.O.M.F. ¶ 4; Def.'s Resp. to Pl.'s Counter-
S.O.M.F. ¶ 4.)

       Trooper Hurley testified that on his way to the nurse's
office, he heard Plaintiff yelling, "I'm not going to the
fucking hospital. You're not fucking taking me.  I'm not going.
I want to go home." (Def.'s S.O.M.F. ¶ 21.)  At this point,
Plaintiff was seated in a desk facing the nurse's office.
(Def.'s S.O.M.F. ¶ 17; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 15-19.)
Once he arrived at Nurse Land's office, Trooper Hurley
positioned himself to Plaintiff's left, while Trooper DePinto
stood in front of the desk in which Plaintiff was seated.
(Def.'s S.O.M.F. ¶¶ 22-23; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 22-

23.)  Trooper Hurley testified that while Plaintiff was seated
in the desk, the two troopers allowed Plaintiff to "vent out and
yell."  (Def.'s S.O.M.F. ¶ 24.)

Plaintiff, however, maintains that he was not acting
disorderly and disruptive.  Instead, he claims that during the
10 to 20 minutes he was seated outside of the nurse's office, he
was listening to music and talking to the school security guard,
a substitute teacher at the school, and his cousin Tony Paz,
also a student at Sequoia. (Pl.'s Supplemental S.O.M.F. ¶ 3;
Pl.'s Br. in Opp., Ex. C 34:10-35:1-10; 39:18-40:2.)

Both parties agree that Paz, who was now down the hall,
aggravated the situation by yelling, "[w]hat are you doing with
my fucking cousin?  What are you doing?  Why don't you just let
him go?"  (Def.'s S.O.M.F. ¶ 26; Pl.'s Resp. to Def.'s S.O.M.F.
¶¶ 26-37.)  Consequently, Paz was removed from the scene.
(Def.'s SOMF ¶ 27; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 26-37.)

Plaintiff then asked the troopers if he could call his
mother.  (Def.'s S.O.M.F. ¶ 28; Pl.'s Resp. to Def.'s S.O.M.F.
¶¶ 26-37.)  After being given permission, he used his cell phone
to see if his mother could drive him "wherever [h]e had to go."
(Def.'s S.O.M.F. ¶ 29; Pl's Resp. to Def.'s S.O.M.F. ¶¶ 26-37.)
Plaintiff's mother told him this would not be possible.[8] (Def.'s

---

[8]    Sequioa requires that students being transported to the
hospital must travel in an ambulance. (Def.'s Mot. for Summ. J.,

S.O.M.F. ¶ 30; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 26-37.)
Plaintiff testified that during the phone conversation his
mother got a little angry, causing him to get a little angry
back. (Def.'s S.O.M.F. ¶¶ 31-32; Pl.'s Resp. to Def.'s S.O.M.F.
¶¶ 26-37.) Trooper Hurley asserts that none of Plaintiff's
anger during the call was directed at either trooper. (Pl.'s
Supplemental S.O.M.F. ¶ 8; Def.'s Resp. to Pl.'s Counter-
S.O.M.F. ¶ 8.)

After hearing a door open in a hallway on his left, Trooper
Hurley's attention was diverted away from Plaintiff. (Def.'s
S.O.M.F. ¶¶ 34-37; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 26-37.) As
Trooper Hurley focused on the hallway, Plaintiff rose out of his
chair, cocked his arm back, and threw his cell phone to the
ground. (Def.'s S.O.M.F. ¶¶ 37, 41; Pl.'s Resp. to Def.'s
S.O.M.F. ¶¶ 26-37, 41-42.)

Trooper Hurley testified that when Plaintiff stood up to
throw his cellphone, Hurley thought Plaintiff was attempting to
throw an object at him. (Def.'s S.O.M.F. ¶¶ 38-39.) Trooper
Hurley further testified that he did not know at the time that
the object in Plaintiff's hand was a cell phone. (Def.'s
S.O.M.F. ¶ 39.) Thus, Trooper Hurley testified that he felt

---

Ex. D 32:9-33:3.) Therefore, allowing Plaintiff travel to the
hospital with his mother is against school policy. (*Id.*)
Plaintiff never mentions being informed of this policy in his
deposition.

Plaintiff threatened his safety. (*Id*. at ¶ 43.)  Additionally, Trooper DePinto asserts that Plaintiff had not been searched and, thus, could have grabbed any item from his pocket, including a knife. (Def.'s S.O.M.F. ¶ 40.)

Conversely, Plaintiff insists that his arms and hands were in plain view prior to the throwing of his phone, and that Trooper DePinto was watching Plaintiff the entire time Plaintiff was on the phone.  (Pl.'s Resp. to Def.'s S.O.M.F. ¶ 38.)

Immediately after Plaintiff threw his cell phone to the ground, Troopers Hurley and DePinto grabbed Plaintiff in an attempt to restrain him.  (Def.'s S.O.M.F. at ¶¶ 44-45.)  The troopers argue that they were trying to restrain Plaintiff, and place him back in his chair.  (*Id*. at ¶¶ 44-46.)  In contrast, Plaintiff believes the defendants were trying to remove him from his chair.  (Pl.'s Resp. to Def.'s S.O.M.F. ¶ 46.)  The school security guard assisted in restraining the Plaintiff.  (Def.'s S.O.M.F. ¶ 49; Pl.'s Resp. to Def.'s S.O.M.F. ¶ 49.)

Plaintiff testified that after he was removed from his chair, Troopers DePinto and Hurley placed him in a chokehold and threw him face first into the ground.  (Pl.'s Br. in Opp. Ex. C 50:4-22.)  Troopers DePinto and Hurley, however, both testified that they did not intend to throw Bou to the ground, but instead accidentally fell to the ground while in the process of escorting Plaintiff outside of the school.

In her deposition, Nurse Land testified that Plaintiff was
"very angry" and resisting the troopers while they attempted to
calm him down.  (Def.'s Br. in Supp. Ex. F 47:15-23.)  However,
according to Plaintiff, he did not struggle with the troopers,
and once he was on the ground he was screaming and afraid.
(Pl.'s Resp. to Def.'s S.O.M.F. ¶ 48.)  Additionally, Trooper
DePinto testified that although Plaintiff resisted, he was not
"kick[ing] or punch[ing] or anything like that." (Pl.'s Br. in
Opp., Ex. E 34:9-15.)  Plaintiff was ultimately handcuffed and
placed in the back of a police car until the ambulance arrived.
(Def.'s S.O.M.F. ¶¶ 57-59; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 56-
59.)

As a result of hitting the ground, Plaintiff suffered
"choke marks on his neck, swelling, and a black eye." (Def.'s
S.O.M.F. ¶¶ 60-61; Pl.'s Resp. to Def.'s S.O.M.F. ¶¶ 60-61.)
Plaintiff has not supplied an expert report regarding the
permanency of any mental or physical injuries. (Def.'s S.O.M.F.
¶ 62; Pl.'s Resp. to Def.'s S.O.M.F. ¶ 62.)

Plaintiff filed his initial Complaint on October 31, 2011
naming Trooper DePinto, Trooper Hurley, the New Jersey State
Police, and the State of New Jersey as defendants.  (Dkt. No.
1.)  On February 29, 2012, Defendants filed a Motion to Dismiss
the Complaint.  (Dkt. No. 6.)  On March 12, 2012, Plaintiff
amended his Complaint, dropping claims against the New Jersey

State Police under § 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2. (Dkt. No. 8.) Thereafter, all defendants filed a second motion to dismiss, seeking a dismissal of Count II of the Amended Complaint. (Dkt. No. 11.) Pursuant to an Order and Opinion dated May 7, 2012, this Court granted Defendant's Motion to Dismiss Count Two of the Amended Complaint, dismissing claims asserted against the New Jersey State Police and the individual troopers under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

Remaining in this action are claims against Troopers DePinto and Hurley in their individual capacities for use of excessive force against Plaintiff in violation § 1983 and the New Jersey Civil Rights Act, as well as common law claims for battery, assault, and intentional infliction of emotional distress. Pending before the Court is Troopers DePinto and Hurley's Motion for Summary Judgment.

## II.

### A.  Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court

10

must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of establishing that no genuine issue of material fact remains. "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a

11

material fact is genuine if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.
*See Anderson,* 477 U.S. at 252.


B.  **Use of Video Evidence**

The existence in the record of a videotape capturing the
event at issue presents an "added wrinkle" to the summary
judgment analysis.  *See Scott v. Harris*, 550 U.S. 372, 378
(2007).  The United States Supreme Court has held that when
there are video recordings of the event at issue which
"blatantly contradict" the non-movant's version of the facts so
that "no reasonable jury could believe [the non-movant]," the
court need not adopt the non-movant's version of the facts.  *Id.*
*at* 380.  Instead, under such circumstances, a court should view
"the facts in the light depicted by the videotape." *Id.* at 380-
81.

In the instant case, Sequoia's security camera captured
Troopers DePinto and Hurley's attempt to restrain Plaintiff.
After having viewed this video footage, the Court cannot
conclude that it so clearly contradicts Plaintiff's story that
no reasonable jury could believe him.  The video provided by the
parties[9] is thirty seconds long.  Additionally, it begins just

---

[9]    The surveillance video was submitted to the Court as Exhibit
G to Defendants' Brief in Support of Motion for Summary

two seconds before Plaintiff stands up to throw his cell phone,
meaning that the Court is unable to determine whether or not
Plaintiff was sitting calmly and quietly prior to throwing his
phone, or whether he was acting irate by yelling and using foul
language.[10]  After Plaintiff throws his phone to the ground, the
video shows Trooper Hurley immediately grab Plaintiff, and
Trooper DePinto assist Trooper Hurley.  A scuffle ensues near
the desk where Plaintiff had been sitting; however, a column and
the troopers' own bodies obstruct the camera so that the Court
cannot determine whether the troopers are attempting to sit
Plaintiff back down in his chair, or move Plaintiff away from
his chair.

Shortly thereafter, the video shows the school security
guard walk over and grab Plaintiff by the left arm.  The
troopers and the school security guard then walk Plaintiff
around the column to a hallway on the left of where Plaintiff
was originally seated.  At this point everyone drops to the
ground.  However, based on the video, the Court cannot determine
whether everyone fell to the ground, or the troopers threw
Plaintiff to the ground.  Further preventing the Court from

_____

Judgment, and as Exhibit A to Plaintiff's Opposition to
Defendants' Motion for Summary Judgment.

[10]    In addition, the video lacks sound. Therefore, the Court
would be unable to hear the Plaintiff yelling or using the
alleged foul language even if the video clip did begin earlier.

finding that the video blatantly contradicts Plaintiff's
testimony that the troopers threw him to the ground is the fact
that in the process of dropping to the ground, the troopers, the
security guard and the Plaintiff all exit the field of view of
the security camera.

Accordingly, the Court cannot conclude that the video
footage so blatantly contradicts Plaintiff's version of events
that no reasonable jury could believe him.


### III.

A.  <u>**Excessive Force**</u>

Counts I and III of Plaintiff's Amended Complaint allege
that Troopers DePinto and Hurley subjected Plaintiff to
excessive force.  Specifically, Count I alleges, pursuant to
§ 1983, that the troopers' use of excessive force deprived
Plaintiff of his rights under the Fourth and Fourteenth
Amendments to the United States Constitution.  Count III
alleges, pursuant to N.J.S.A. 10:6-2, that the troopers deprived
Plaintiff of his rights under Article 1, Paragraph 7 of the New
Jersey State Constitution.  The standard for evaluating an
excessive force claim under the New Jersey Constitution is the
same as under the United States Constitution.  *See Norcross v.*
*Town of Hammonton*, 2008 WL 9027248, at *4 (D.N.J. 2008)
(explaining that the "Court sees no reason to conclude that in

14

the context of a claim for excessive force during an arrest, the standard under the New Jersey Constitution for evaluating those claims is different from that under the United States Constitution").

Thus, under both the New Jersey Constitution and the United States Constitution, in order to determine whether the force used by Troopers DePinto and Hurley was excessive, the Court must determine whether their actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to [their] underlying intent or motivation." *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). To determine whether the troopers' actions in this case were objectively reasonable, the Court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Other factors to consider include "'the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006) (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)). Additionally, "the 'reasonableness' of a particular use of force

15

must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In the instant case, the Court finds that there are genuine issues of material facts which prevent the Court from granting summary judgment as to Plaintiff's excessive force claims. Plaintiff's testimony that he was listening to music and chatting with his cousin, a school security guard, and a substitute teacher while waiting outside the Nurse's office contrasts sharply with the testimony of Troopers DePinto and Hurley, who assert that Plaintiff was yelling, cursing and irate. Further, the parties dispute the amount of force that the troopers actually used. Plaintiff maintains that he was not resisting the troopers' attempts to restrain him, but that the troopers nonetheless removed Plaintiff from his desk, placed him in a chokehold and threw him on the ground. Troopers DePinto and Hurley, in contrast, maintain that they were simply trying place Plaintiff back in his chair, and fell to the ground while doing so. A videotape of the event does not conclusively prove one side's depiction of the events to be correct.

Absent resolution of these fact disputes, the Court cannot analyze many of the factors used to determine whether the troopers' actions were "objectively reasonable." For example, without knowing how irate Plaintiff was prior to being

16

restrained, whether Plaintiff resisted the troopers, or whether
the troopers employed a chokehold and threw Plaintiff to the
ground, the Court cannot determine whether Plaintiff posed an
immediate threat to the safety of the officer or others, or
whether Plaintiff was actively resisting arrest or attempting to
evade arrest by flight. Therefore, the Court cannot conclude
that no reasonable jury could find that the troopers did not use
excessive force.


**B. <u>Qualified Immunity</u>**

Under the doctrine of qualified immunity, "officers
performing discretionary functions are 'shielded from liability
for civil damages insofar as their conduct does not violate
clearly established statutory or constitutional rights of which
a reasonable person would have known.'" *Curley v. Klem*, 298
F.3d 271, 277 (3d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457
U.S. 800 (1982)). Thus, "qualified immunity strikes a balance
by permitting a plaintiff to recover for constitutional
violations where the governmental officer was plainly
incompetent . . . or knowingly violate[d] the law, while
immunizing a defendant who made a reasonable mistake about the
legal constraints on his actions." *R.K. v. Y.A.L.E. Sch. Inc.*,
621 F. Supp. 2d 188, 196 (D.N.J. 2008) (internal citations and
quotations omitted).

The Supreme Court has established a two-part analysis for determining whether a government officer is entitled to qualified immunity. *See Ray v. Twp. of Warren*, 626 F.3d 170, 174 (3d Cir. 2010) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The first question is whether an official's conduct violated a constitutional or federal right. *Saucier*, 533 U.S. at 201. "This is not a question of immunity, but whether there is any wrong to address." *Ray*, 626 F.3d at 174. The second question is whether the right at issue was "clearly established." *Id.* These questions need not be answered in sequence. *See Ray*, 626 F.3d at 174. Instead, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Although Troopers DePinto and Hurley purportedly make a qualified immunity argument, they appear to be arguing that there was no constitutional violation. (Def.'s Br. in Supp., at 14 (arguing that "not only was the law not clearly established on this point, it actually permitted the use of such force under the circumstances presented.")) The Court will not reach the question of qualified immunity here because, as explained above, it is not clear whether there has been a constitutional violation. If, on the one hand, there has been no violation,

there is no need for qualified immunity.  On the other hand, if Plaintiff's testimony proves accurate and Troopers DePinto and Hurley used excessive force when restraining Plaintiff, qualified immunity will not protect the troopers because the right to be free from excessive force is a clearly established constitutional right.  *See Platt v. Gonzalez*, 2011 WL 2413264, at *3 (D.N.J. 2011).

## C. Assault and Battery

In addition to claims under § 1983 and N.J.S.A. 10:6-2, Plaintiff asserts common law claims for assault and battery against Troopers DePinto and Hurley.  Troopers DePinto and Hurley argue that their motion for summary judgment should be granted as to these claims because if the force used against Plaintiff was not excessive, then the troopers cannot be liable for assault and battery.  (Def.'s Br. in Supp., at 15.)  The troopers further argue that Plaintiff's assault and battery claims are barred by New Jersey's good faith defense, codified at N.J.S.A. 59:3-3.

The Court is not persuaded by either of the troopers' arguments.  While the troopers are correct that a police officer will generally not be liable for assault or battery unless the force used was excessive, *see Hill v. Algor*, 85 F. Supp. 2d 391, 411 (D.N.J. 2000), the Court has already stated in its § 1983

19

analysis that genuine issues of material fact preclude summary judgment as to the issue of whether the force used was excessive.  Therefore, the Court cannot grant summary judgment dismissing Plaintiff's assault and battery claims.

As to the troopers' good faith argument, N.J.S.A. 59:3-3 provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law."  The New Jersey Supreme Court has held that "[t]he same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under" N.J.S.A. 59:3-3.  *Wildoner v. Borough of Ramsey*, 744 A.2d 1146, 1153 (N.J. 2000); *see also R.M. v. Sainato*, 2012 WL 1623860, at *8 (D.N.J. 2012).  As the Court has already determined that genuine issues of material fact preclude summary judgment on the issue of whether Troopers DePinto and Hurley were objectively reasonable in restraining Plaintiff, the Court cannot find that the troopers acted in good faith under N.J.S.A. 59:3-3.

## D. Intentional Infliction of Emotional Distress

Defendant's Motion for Summary Judgment will be granted as to Plaintiff's claim for intentional infliction of emotional distress (IIED).  To succeed on an IIED claim, a plaintiff must prove "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe."  *Buckley v.*

*Trenton Saving Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988).
Plaintiff's claim for IIED must fail because Plaintiff has
failed to show that the troopers' actions were "outrageous" or
that Plaintiff suffered "severe" emotional distress.

Intentional and outrageous conduct is conduct that is "so
outrageous in character, and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized community."
*Id*. Thus, outrageous conduct is found only in the most extreme
circumstances. *See Antoine ex rel. Antoine v. Rucker*, 2006 WL
1966649, at *15 (D.N.J. 2006) (compiling cases); *see also Hume
v. Bayer*, 178 N.J. Super. 301, 428 (Law Div. 1981) (finding
outrageous conduct where a physician, knowing it to be false,
told parents that their son was suffering from cancer); *Muniz v.
United Hosp. Med. Ctr. Presbyterian Hosp.*, 79 A.2d 57 (App. Div.
1977) (finding outrageous conduct where a hospital was unable to
locate the body of a deceased baby for three weeks). Other
examples of outrageous conduct include "spreading a false rumor
that plaintiff's son had hung himself; bringing a mob to
plaintiff's door with a threat to lynch him if he did not leave
town; and wrapping up a gory dead rat inside of a loaf of bread
for a sensitive person to open." *Hume*, 178 N.J. Super. at 315.

In the instant case, Plaintiff alleges that Troopers
DePinto and Hurley unreasonably placed him in a chokehold and

21

tackled him in an attempt to restrain him during a medical
assist.  Even if true, the conduct of the troopers does not do
not rise to the level of any of the conduct described above, and
certainly does not constitute conduct "so outrageous in
character and so extreme in degree as to go beyond all possible
bounds of decency." *See Antoine*, 2006 WL 1966649, at *15
(finding no outrageous conduct where plaintiff alleged police
officers beat him without provocation and arrested him without
probable cause in retaliation for exercising his free speech
rights and because plaintiff was of Haitian origin).

Plaintiff's IIED claim also must fail because Plaintiff has
not shown that he has suffered severe emotional distress.  The
requisite level of emotional distress to sustain a claim for
IIED is distress "so severe that no reasonable [person] could be
expected to endure it." *Id*.  Symptoms such as "aggravation,
embarrassment, an unspecified number of headaches, and loss of
sleep[]" are insufficient as a matter of law to establish a
claim for IIED. *Id*. at 864.

Not only has Plaintiff not shown that he suffered severe
emotional distress, he has not shown that he has suffered any
emotional distress.  Beyond the bare allegation in his Second
Amended Complaint that he suffered "emotional trauma," (Compl. ¶
51) Plaintiff makes no mention of, and certainly produces no
evidence of, any form of emotional distress.  Therefore, no

22

reasonable jury could possibly find that Plaintiff suffered severe emotional distress as a result of Troopers DePinto and Hurley's actions.

**IV.**

For the foregoing reasons, Troopers DePinto and Hurley's Motion for Summary Judgment is denied as to all of Plaintiff's claims except Plaintiff's claim for IIED.  Plaintiff's IIED claim will be dismissed.  An appropriate Order will accompany this Opinion.

Date: August  26 , 2013            _____s/Joseph E. Irenas_____
                                    **JOSEPH E. IRENAS, S.U.S.D.J.**